## UNITED STATES DISTRICT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____<br>ALLAN MILLER, DENNIS CALLAGY,<br>THE CHESTER S. JAKUBOWSKI ROTH IRA,<br>RICHARD GABRIEL, VICTORIA DUDIN<br>SILIOUTINA, GEOFFRY MEEK, GENE<br>ROBINSON, ERIC BROWN, SCOTT NOONE,<br>JOHN MURGO, and MAX KUPCHIK<br>       Plaintiffs,<br>          v.<br><br>ALESSANDRO DONNINI, SRIDHAR<br>SANTHANAM, HFN, INC,<br>SATISH CHANDRA, CHETAN CHANDRA,<br>ACRIS TECHNOLOGIES, PRIVATE, LTD.<br>       Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)    1:14-cv-____1:14-cv-12337<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT AND JURY DEMAND

"Draw the curtain, the fraud is over."

Francois Rabelais

### INTRODUCTION

This is an action brought by eleven minority shareholders of HandsFree Networks,

Inc. ("HandsFree") against Defendants who successfully deprived them of the full worth

of their investment.  At their core, the facts reflect an oft-told story of prevarication and

greed.  Those facts, which form the basis of this Complaint, were hidden from the

minority shareholders as a result of the manipulations and misrepresentations of the

Defendants.  Essentially, the Defendants' concerted actions led the minority shareholders

to what appeared to be the inescapable conclusion that their interest in HandsFree had

little value. As a result, each agreed to redeem their shares for very little money, as part

of the sale of the assets of HandsFree to a shell corporation, HFN, Inc. ("HFN").

In fact, unbeknownst to the minority shareholders, HandsFree had established an ongoing profitable relationship with Dell Inc. ("Dell") and had signed a contract with HCL Comnet Systems and Services, Ltd. ("HCL").  If the true value of these contracts had been revealed to the minority shareholders, they never would have agreed to redeem their shares, as the burgeoning relationships with Dell and HCL rocketed the value of HandsFree. But rather than disclose the true nature of these relationships and the significant impact they had on the value of HandsFree, the Defendants, Sridhar Santhanam ("Santhanam"), Alessandro Donnini ("Donnini"), and Satish Chandra ("Chandra") actively concealed them so as to facilitate the sale of the assets of HandsFree to the shell corporation, HFN, a transaction in which of the Defendants benefitted tremendously.

## PARTIES

1. Plaintiff, Allan Miller ("Miller"), is an individual residing in Palo Alto, California. At all relevant times, Miller was a shareholder of HandsFree.

2. Plaintiff, Victoria Dudin (*nee* Silioutina) ("Dudin"), is an individual residing in Swampscott, Massachusetts.  At all relevant times, Dudin was a shareholder of HandsFree.

3. Plaintiff, Geoffry Meek ("Meek"), is an individual residing in Providence, Rhode Island.  At all relevant times, Meek was a shareholder of HandsFree.

4. Plaintiff, The Chester S. Jakubowski Roth IRA ("Jakubowski"), is a beneficiary in Boston, Massachusetts.  At all relevant times, Jakubowski was a shareholder of

HandsFree.

5.   Plaintiff, Eric Brown ("Brown"), is an individual residing in Mountain View, California.  At all relevant times, Brown was a shareholder of HandsFree.

6.   Plaintiff, Scott Noone ("Noone"), is an individual residing in Amherst, New Hampshire.  At all relevant times, Noone was a shareholder of HandsFree.

7.   Plaintiff, Dennis Callagy ("Callagy"), is an individual residing in Cocoa, Florida. At all relevant times, Callagy was a shareholder of HandsFree.

8.   Plaintiff, Richard Gabriel ("Gabriel"), is an individual residing in Redwood City, California.  At all relevant times, Gabriel was a shareholder of HandsFree.

9.   Plaintiff, Gene Robinson ("Robinson"), is an individual residing in West Newbury, Massachusetts. At all relevant times, Robinson was a shareholder of HandsFree.

10.  Plaintiff Max Kupchik is an individual residing in Newport, Rhode Island.  At all relevant times, Kupchik was a shareholder of HandsFree.

11.  Plaintiff, John Murgo ("Murgo"), is an individual residing in Holliston, Massachusetts.  At all relevant times, Murgo was a shareholder of HandsFree.

12.  Defendant, Alessandro Donnini ("Donnini"), is an individual residing in Newton, Massachusetts.

13.  Defendant, Sridhar Santhanam ("Santhanam"), is a citizen of India residing in Chennai, India.

14.  Defendant, HFN, Inc. ("HFN"), is a Delaware corporation with a principal place of business located in Newton, Massachusetts.

15.  Defendant Satish Chandra ("Chandra"), is a citizen of India and resides in Bangalore, India.

16. Defendant Chetan Chandra ("Chetan"), is a citizen of India and resides in San Diego, California.

17. Defendant Acris Technologies Private Limited ("Acris"), is an India corporation and is headquartered in Chennai, India.

## JURISDICTION AND VENUE

18. The claims asserted here arise in part under Sections 10(b) and 20(a) of the Exchange Act of 1933, 15 U.S.C. § 78(j)(b) and 15 U.S.C. § 78(t)(a) and Rule 10b-5, promulgated by the U.S. Securities and Exchange Commission (17 CFR 240.10b-5).

19. This Court has jurisdiction over the subject matter in these claims pursuant to 28 U.S.C. § 1331 in that the claims assert a federal question, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20. This Court has jurisdiction over the state claims asserted here pursuant to 28 U.S.C. § 1367.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act (15 U.S.C. § 78aa(c)) in that substantial acts in furtherance of the fraud and other claims occurred in this Judicial District.  Furthermore, HandsFree was headquartered in this District.

22. In connection with the acts, transactions and conduct alleged in this Complaint, the Defendants used the means and instrumentalities of interstate commerce, including United States mail, interstate telephone communications, internet communications and federal roads.

## OVERVIEW

23. On January 18, 2012, three HandsFree board members - Santhanam, Donnini and

Chandra - gathered the shareholders together on a conference call to deliver dismal news. The company had been losing money for years, they told the shareholders, and now they needed to sell it off to an outside investor whom they refused to identify. Santhanam, Donnini and Chandra admitted that they had not yet even sought a value for the company. But they said that HandsFree had no viable customers, no contracts, no revenue and none of these even on the horizon, so the shareholders would be lucky to get any money at all for their shares.

24.    Three months later, the shareholders' stock was liquidated. At about the same time, an equity firm, New Enterprise Associates-IndoUS Ventures LLC ("NEA-IUVP"), invested $4 million for 40% of a new company, HFN, that Santhanam and Donnini had formed. HFN purchased the assets of HandsFree for well below true value, funneling a portion of the funds from NEA-IUVP to HandsFree, which, through Santhanam and Donnini, paid Chandra about $2 million to liquidate his controlling shares, and paid the remaining minority shareholders only about $21,000. One shareholder who had invested $100,000 received only a $642 payback. On the other side of the coin, Chandra doubled his money in one year and received $2 million for his $1 million investment. Donnini, Sanathanam and NEA-IUVP became shareholders in HFN, knowing that it had, in fact, received the lucrative Dell contract, the equally promising HCL contract, the operational software to support both contracts and future sales, and the two early patents in the field already granted by the US Patent Office.

25.    NEA-IUVP's investment demonstrated that HandsFree was actually worth at least $10 million at the time, and probably far more, since the investment was made in a hurry and without any competitive bidder. Santhanam and Donnini each received

substantial shares in HFN, and a short two years later, Santhanam is seeking a second round of investment with a valuation of $50 million to $100 million for the company. This new valuation represents no new customers other than an old deal that was finally closed a few weeks ago.

26. The fraud perpetrated upon the minority shareholders was made possible by Santhanam, Donnini, and another HandsFree employee, Vidhyacharan Ponnusamy ("Ponnusamy") taking affirmative steps to hide three pieces of crucial information from the shareholders while revealing this information to NEA-IUVP.

27. The first of these was the current revenue from a contract HandsFree had with Dell. Santhanam, Donnini, and Ponnusamy had directed Dell to withhold HandsFree invoices in order to depress the apparent financial condition of the company from the perspective of the minority shareholders. The second was the expected sales from the Dell contract. Santhanam and Donnini failed to reveal to the minority shareholders that Dell had projected a substantial increase in purchases from HandsFree. The third was the expected sales from a contract HandsFree had with HCL. Santhanam and Donnini utterly failed to inform the minority shareholders that HandsFree had even signed the contract with HCL. In fact, in the January 18, 2012 meeting, they told the shareholders that HandsFree had no viable customers or revenue at all.

28. The opposite was, of course, true. Based on its contract with Dell, and its recently signed contract with HCL, HandsFree was poised for rapid growth.

29. Naturally, when Santhanam, Donnini, and Ponnusamy went looking for an investor to complete the fraud they were perpetrating on the minority shareholders, they sang a far different tune. Their acts were driven by greed, orchestrated by their

access to HandsFree's valuable software, and sealed by the cooperation of a new

investor, NEA-IUVP.

## FACTS

30.  HandsFree was founded in 1999 by Miller, Callagy and Donnini. It was

headquartered in Newton, Massachusetts and incorporated in Delaware.

HandsFree's  product was one of the world's first remote computer support systems.

31.  A remote computer support system allows computer administrators to diagnose and

repair problems with devices without requiring physical access to the devices,

allowing the administrators to save money and leverage their expertise to many

more customers. Remote computer support spawned the managed services industry,

which was about a $66 billion annual worldwide market in 2011.  The HandsFree

Networks product was a leader in the automation of management functions, which

continues to be a major growth area in the managed services market.

32.  Miller wrote the initial software product and oversaw all product design and

execution, while Donnini oversaw all sales and marketing activity, provided much

of the customer support, and participated in product design.  The HandsFree

product was well received by its customers and found a loyal following.

33.  Nevertheless, for the first decade of operation, HandsFree did not make enough

revenue to support itself. To keep the company afloat, Miller and Donnini

attempted to raise investment capital, but were largely unsuccessful. Instead, Miller

and Donnini had to support the company with cash infusions of their own.

Meanwhile, rival companies demonstrated the huge market for similar products,

with large and rapid growth.

34.  By late 2007, the relationship between Miller and Donnini became acrimonious and

neither wanted to continue working together.  After Donnini failed to negotiate a deal with two competitive buyers offering an exit from the company, Donnini was approached by an Indian businessman, Sridhar Santhanam, who offered to buy the company through his company, Acris Technologies.  In March 2008, Acris obtained a 60% interest in HandsFree, in exchange for which Acris agreed to pay $325,000.00 in equal installments over a 24 month period.   Through Acris, Santhanam became a principal in HandsFree.

35.   Miller continued working with Santhanam for about nine months. During this time, the technical staff at HandsFree, including Miller, spent most of their time trying to teach the Indian staff about the product and its positioning in the marketplace. However, Santhanam's marketing plans found no new customers, and also caused a number of the existing customers to leave.

36.   In 2009, Chandra acquired an 85% interest in Acris for $1,000,000 and through that investment became involved in HandsFree. Miller first learned of Chandra's involvement when Chandra requested to meet with him after Chandra learned that Miller had done virtually all of the company's software development.

**HandsFree Hits Milestones, But Investors Kept in Dark**

37.   Between April 2009 and May 2010, HandsFree attempted to secure a contract with Dell.  The company started a test with Dell in May of 2010.  The test was successful and Dell signed a contract to sell the product on November 9, 2010.

38.   However, Santhanam and Donnini kept the success with Dell and the magnitude of the revenue a secret.  Instead, Santhanam and Donnini chose to pass along only dour reports reflecting problems with Dell.

39.   Discouraged by this news, sometime before May 2011, Chandra offered to exit his

investment in Acris if Santhanam could promise him the return of 200% on his investment, or $2,000,000 total. Santhanam agreed to this deal, and Santhanam and Chandra entered into an agreement that was never revealed to any of the minority shareholders. The agreement had a built-in deadline that put a strong pressure on Santhanam to find another investor quickly.

40. Starting in June 2011, with a price tag in hand, Santhanam, Donnini, and Ponnusamy began to look for a venture investor to put $4 million into the company: $2 million to buy out Chandra and the rest for capital for the company.

41. At the same time that Santhanam began shopping HandsFree around to investors, the company completed a test with HCL. As a result of the test, HCL concluded that it wanted to continue the development of the product, estimating the deployment potential to be 8 million installations.

42. In addition, Santhanam and Donnini had projections from Dell regarding its plans to rapidly expand its purchases of the HandsFree product. Dell, in fact, revealed that the HandsFree product was being used on 12-15% of customer service calls but that it estimated the product could be used on 55% of the calls, a 5x increase in utilization (and revenue).

43. Knowing that HandsFree had now gained significant value through the contracts with Dell and HCL, Santhanam and Donnini kept the new business and revenue a secret from the shareholders so that the company could be sold at a bargain price.

44. To keep the revenue a secret, for the last half of 2011 and the first quarter of 2012, they requested that Dell not pay HandsFree invoices.

45. For example, on April 1, 2011, an email from HandsFree to Sydney Lewis and others at Dell requested that "[d]ue to year-end accounting and business

transformation happening to HFN USA. [sic] We would request you to postpone all HFN invoice payment scheduled on April 5 to 5th, May."

46. Dell complied with the request. Despite the fact that HandsFree accounting was on an accrual basis, the missing Dell revenue was kept off the HandsFree books. The delay kept up through the rest of 2011 and the first quarter of 2012.

47. While Donnini and Santhanam presented HandsFree's shareholders with a gloomy picture, it was an entirely different story for potential buyers.

48. For example, on June 11, 2011, Santhanam wrote in an email to Sandeep Singal at Nexus India Capital Advisors Pvt Ltd, that HCL had "given a green signal to the technology" and that a contract was about five weeks away.   (In fact, a contract with HCL was executed in December 2011, but the minority shareholders were never told of this development.)

49. On October 3, 2011, Santhanam, Donnini, and Ponnusamy made a presentation to Kumar Shiralagi at NEA-IUVP and provided the true financial picture of the company, including the fact that Dell was a loyal customer of HandsFree already generating significant revenue with existing products, and that revenue projections with HCL were potentially $160 million a year.

50. Based on these revelations, NEA-IUVP offered to invest $4 million in return for a 40% stake in the company, indicating their valuation of at least $10 million for the company.   The actual valuation was presumably more, since Santhanam had significant time pressure, and there was no competitive bidder.

51. With the offer from NEA-IUVP in hand, Santhanam and Donnini schemed to get rid of the original shareholders for about $21,000, buy out Chandra for $2 million, and use the remaining $2 million to continue operations, service the Dell and HCL

contracts and increase the value of the company.

52.  In the January 2012 call to the original shareholders, Santhanam and Donnini rattled off to the shareholders the reasons that HandsFree held little value.  There was no client, no revenue and no prospect of any (so saith Santhanam, or so lieth Santhanam) "There's about $100,000 debt in the company, number one. Number two is, there's no great client running around the company today, we have in the last ten years of HFN history, we never had a good great name company as a client... I'm not saying it will never change at all - it can change a bit - but the history's here, and you cannot get a million dollar three hundred million dollar business but.... because [Chandra] has put his hard-earned money into the business and he wants to get this out, and, and, and, and I have not taken a single Rupee out of it, and I put three years of time into it."

53.  The shareholders tried to get reasonable information.  In fact, Santhanam's long-winded lie above was his answer to Robinson's simple question:  "Do we have any idea what the company is valued at?"  The entire meeting was mostly lies and stonewalling by Santhanam, Chandra, and Donnini.  Near the end of the meeting, Donnini declared to the entire group of shareholders, "So if you are even here, if you are even considering getting $2 for your shares, guess what, you can go buy yourself a cup of coffee that you wouldn't have been able to buy before," knowing full well that he had done a deal to secure a 5% stake in a $10 million valuation of the assets he was referring to.

54.  In an email on February 1, 2012, Santhanam falsely informed Dell that the asset purchase had been "approved by ALL shareholders of HandsFree," which was not

true, and that the action was intended to give a "cleaner balance sheet" to NEA-IUVP.

55.    On February 19, 2012, Santhanam sent a letter to the shareholders, seeking the shareholders' approval for the transfer of HandsFree's assets to a new shell company called HFN, Inc.  The letter attached an analysis of HandsFree that valued the company at $243,973.  A separate analysis by American Appraisal was based solely on the value of HandsFree's intellectual property and projected a valuation of $1,730,000 by the end of 2012.  This valuation was based solely upon information provided by HandsFree's management, aside from publicly-sourced material used to analyze the background environment. The valuation did not include consideration of the Dell and HCL contracts and included only a portion of the income received from Dell.

56.    Had the valuation included consideration of the Dell and HCL contracts, and HandsFree's actual revenue, HandsFree would have been valued far higher than it was.  In fact, NEA-IUVP, with access to the correct financial information, valued the company for at least $10 million, and probably more due to the time pressure and lack of a competitive bidder.

57.    Santhanam, Donnini and NEA-IUVP quickly closed their deal in April 2012. With the new cash, Santhanam and Donnini had Chetan pay out Chandra a handsome return doubling his investment after one year, yet close out all of the original investors for about $21,000 total, telling them this amount reflected HandsFree's worth.  In fact, however, many of the shareholders have never received any compensation for their shares.  At least one shareholder was never even informed of the January 18, 2012 call.

58.   On June 12, 2012, HFN, Inc. filed a Form D (Notice of an Offering Without Registration) statement with the SEC, stating that HFN had no revenues, despite the withheld monies from Dell that were already revenue due to HFN.  NEA-IUVP, Santhanam and Donnini were all on the board of HFN, Inc. and therefore responsible for the SEC filing and the false statement in it.

59.   In mid 2013, Miller received information from an informed source that "blew the whistle" on the machinations that Santhanam, Donnini, Chandra, Chetan, and HFN had pulled, and disclosed how the revenue from Dell and contract with HCL had been kept hidden.

## COUNT I
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

60.   The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

61.   Each of the Defendants carried out a plan, scheme and course of conduct which was intended to and, in fact, did deceive investors, including the plaintiffs, as alleged here, and caused the plaintiffs to suffer damages as a result.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants, and each of them, took the actions described in this Complaint.

62.   The Defendants employed devices, schemes and artifices to defraud, made untrue statements of fact and/or omitted material facts necessary to make the statements not misleading, and engaged in acts, practices and a course of conduct which operated as a fraud and deceit upon the Plaintiffs who owned HandsFree stock.  The Defendants did this in an effort to enrich themselves through undisclosed manipulative tactics by which they wrongfully decreased the value of the

Defendants' shares, in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued as primary participants in the wrongful and illegal scheme described here.

63.   The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged in and participated in a continuous course of conduct to conceal adverse material information about the true value of HandsFree.

64.   These Defendants employed devices, schemes and artifices to defraud and engaged in a course of conduct and scheme as alleged here to unlawfully manipulate and profit from a reduced valuation in HandsFree, and thereby engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon the Plaintiffs.

65.   The Defendants had actual knowledge of the misrepresentations and omissions described here, or acted with reckless disregard for the truth in that they failed to disclose such facts, even though these facts were available to them. The Defendants' material misrepresentations were done knowingly or recklessly for the purpose and effect of concealing the truth.

66.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as described here, the sale of HandsFree was manipulated. In ignorance of the facts that the statements they were receiving from the Defendants were tainted by undisclosed and manipulated information, and relying, directly or indirectly on the false and misleading statements, made by the Defendants and the purported honesty of their business practices, and/or in the absence of material information that was known to the Defendants or recklessly

disregarded by them, but not disclosed in any statements to the plaintiffs, or accessible by the plaintiffs, the plaintiffs sold their undervalued shares and were consequently damaged.

67. At the time of these misrepresentations and omissions, the Plaintiffs were ignorant of their falsity and believed them to be true. Had the Plaintiffs known of the truth concerning the actual value of HandsFree, they would not have sold their shares for the grossly undervalued price offered to them.

68. Because of all of this, the Defendants have violated Rule 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## Count II
### Violations of Section 20(a) of the Exchange Act Against Santhanam, Donnini, and Chandra

69. The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

70. This Claim is brought pursuant to Section 20(a) of the Exchange Act against Santhanam, Donnini, and Chandra, as control persons of HandsFree.

71. It is appropriate to treat these defendants as a group for pleading purposes and to presume that the materially false, misleading, omitted and incomplete information conveyed to the Plaintiffs, directly and indirectly, are the collective actions of Santhanam, Donnini, and Chandra

72. By virtue of their operational and management control in HandsFree, and their systematic involvement in the scheme described here, Santhanam, Donnini, and Chandra each had the power to influence and control, and did influence and control, directly and indirectly, the decision making and actions of HandsFree and/or Acris, including the content and dissemination of the various statements

and omissions that the Plaintiffs contend are false and misleading.  Santhanam, Donnini, and Chandra each had the ability to prevent the issuance of the statements alleged to be false, misleading or omitted, or cause such statements to be corrected or disclosed.

73.     As described above, Santhanam, Donnini, and Chandra each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, by the acts and omissions described in this Complaint.  By virtue of their positions as controlling persons, Santhanam, Donnini, and Chandra are liable pursuant to Section 20(a) of the Exchange Act.  As a direct result of these Defendants' unlawful conduct, the Plaintiffs have suffered damages in connection with their ownership of shares in HandsFree.

## COUNT III
**Breach of Fiduciary Duty**
**Defendant Santhanam**

74.     The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

75.     A fiduciary duty existed between Santhanam and the Plaintiffs by virtue of their status as shareholders in HandsFree.

76.     As described herein, and as in fact occurred, Santhanam breached his fiduciary duty by, *inter alia*, taking steps to hide the true value of HandsFree from his fellow shareholders.

77.     As a direct and proximate result, the Plaintiffs sustained damages.

## COUNT IV
### Breach of Fiduciary Duty
### Defendant Donnini

78.   The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

79.   A fiduciary duty existed between Donnini and the Plaintiffs by virtue of their status as shareholders in HandsFree.

80.   As described herein, and as in fact occurred, Donnini breached his fiduciary duty by, *inter alia*, taking steps to hide the true value of HandsFree from his fellow shareholders.

81.   As a direct and proximate result, the Plaintiffs sustained damages.

## COUNT V
### Breach of Fiduciary Duty
### Defendant Chandra

82.   The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

83.   A fiduciary duty existed between Chandra and the Plaintiffs by virtue of the status of Chandra on the board of directors of HandsFree, and the status of the Plaintiffs as shareholders in HandsFree.

84.   As described herein, and as in fact occurred, Chandra breached his fiduciary duty by, *inter alia*, taking steps to hide the true value of HandsFree from his fellow shareholders.

85.   As a direct and proximate result, the Plaintiffs sustained damages.

## COUNT VI
### Breach of Fiduciary Duty
### Defendant Chetan Chandra

86.   The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

87.   A fiduciary duty existed between Chetan and the Plaintiffs by virtue of the status of Chetan as the Treasurer of HandsFree and the status of the Plaintiffs as shareholders in HandsFree.

88.   As described herein, and as in fact occurred, Chetan breached his fiduciary duty by, *inter alia*, taking steps to transfer funds to Chandra under the terms of an agreement between Chandra and Santhanam that was hidden from the Plaintiffs, and further taking steps to hide the existence of that agreement from the Plaintiffs.

89.   As a direct and proximate result, the Plaintiffs sustained damages.

## COUNT VII
### Breach of Fiduciary Duty
### Defendant Acris Technologies

90.   The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

91.   A fiduciary duty existed between Acris Technologies and the Plaintiffs by virtue of their status as shareholders in HandsFree.

92.   As described herein, and as in fact occurred, Acris Technologies breached its fiduciary duty by, *inter alia*, taking steps to hide the true value of HandsFree from his fellow shareholders.

93.   As a direct and proximate result, the Plaintiffs sustained damages.

**COUNT VIII**
**Fraud**
**Defendant Santhanam**

94.     The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

95.     Santhanam knowingly made misrepresentations of fact, which the Plaintiffs reasonably relied on, in order to induce them to act to their detriment.

96.     The Plaintiffs in fact relied upon the misrepresentations.

97.     As a direct and proximate result, the Plaintiffs sustained damages.

**COUNT IX**
**Fraud**
**Defendant Donnini**

98.     The Plaintiffs repeat and reallege each of the foregoing Paragraphs as if explicitly stated herein.

99.     Donnini knowingly made misrepresentations of fact, which the Plaintiffs reasonably relied on, in order to induce them to act to their detriment.

100.    The Plaintiffs in fact relied upon the misrepresentations.

101.    As a direct and proximate result, the Plaintiffs sustained damages.

**COUNT X**
**Fraud**
**Defendant Chandra**

102.    The Plaintiffs repeat and reallege each and every allegation contained above as if fully stated here.

103.    Chandra knowingly made misrepresentations of fact, which the Plaintiffs reasonably relied on, in order to induce them to act to their detriment.

104.    The Plaintiffs in fact relied upon the misrepresentations.

105.    As a direct and proximate result, the Plaintiffs sustained damages.

**COUNT XI**
**Civil Conspiracy**
**All Defendants**

106.    The Plaintiffs repeat and reallege each and every allegation contained above as if

fully stated here.

107.    As described herein and as in fact occurred, the Defendants conspired to

undertake a scheme by which they deceived the Plaintiffs into selling their shares

in HandsFree for substantially less than their worth.

108.    These nefarious acts occurred through the Defendants' concerted actions and in

furtherance of a common design or agreement.

109.    Each participant knew of the plan and its purpose and took affirmative steps to

encourage the achievement of the result.

110.    As a direct and proximate result, the plaintiffs sustained damages.

**COUNT XII**
**Constructive Trust**
**Defendants Santhanam, Donnini and HFN**

111.    The Plaintiffs repeat and reallege each and every allegation contained above as if

fully stated here.

112.    Through their wrongdoing, Santhanam, Donnini and HFN are holding property

which rightfully belongs to the plaintiffs.

113.     In the case of Santhanam and Donnini, that property consists of the shares in

HFN.

114.    In the case of HFN, that property consists of the assets of HandsFree which were

wrongfully conveyed to HFN.

115.    Santhanam, Donnini and HFN are therefore constructive trustees of property

owned by the plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for relief and judgment as follows:

A. Awarding compensatory damages in favor of the Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest and attorneys' fees.

B. Awarding punitive damages in favor of the Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest.

C.    Awarding the Plaintiffs recission of their contracts with HandsFree and/or HFN, including recovery of all fees that would otherwise apply.

D. Awarding Plaintiffs restitution of all unlawfully or discriminatorily-obtained monies taken from them as described above.

E. Declaring, pursuant to Count XII, that Santhanam, Donnini and HFN are holding property of the plaintiffs in trust and ordering that said property be returned to the plaintiffs.

F. Ordering such other and further relief as this Court shall deem proper and just, including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure that the Plaintiffs have an equitable remedy.

G.    Awarding the Plaintiffs their reasonable costs and expenses incurred in this actions, including counsel and expert fees.

## JURY TRIAL DEMANDED

The Plaintiffs hereby demand a trial by jury.

Respectfully Submitted,
The Plaintiffs,
By Their Attorneys,


____/s/ *Patrick J. Dolan*_____
Patrick J. Dolan BB0 #564250
*pdolan@pdkllp.com*
Perry, Krumsiek & Dolan, LLP
210 Union Wharf
Boston, MA  02109
(617) 720-4300
fax: (617) 720-4310


_/s/ Timothy Cornell_____
Timothy Cornell BBO # 654412
*Timothycornell5@gmail.com*
Gardner Cornell, P.C.
33 Mount Vernon St.
Boston, MA 02107
(603) 277-0838


Dated May 30, 2014