**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ALLAN MILLER, DENNIS CALLAGY, | ) | |
| THE CHESTER S. JAKUBOWSKI ROTH IRA, | ) | |
| RICHARD GABRIEL, VICTORIA DUDIN | ) | |
| SILIOUTINA, GEOFFRY MEEK, GENE | ) | |
| ROBINSON, ERIC BROWN, SCOTT NOONE, | ) | |
| JOHN MURGO, MAX KUPCHIX and | ) | |
| WILLIAM HARDING | ) | |
| Plaintiffs | ) | C.A. No. 14-CV-12337 |
| v. | ) | |
| | ) | |
| ALESSANDRO DONNINI, SRIDHAR | ) | |
| SANTHANAM, HFN, INC., SATISH | ) | |
| CHANDRA, CHETAN CHANDRA, | ) | |
| ACRIS TECHNOLOGIES, PRIVATE, LTD. | ) | |
| Defendants | ) | |

**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS WITH MEMORANDUM OF LAW**

In their Motion to Dismiss the Complaint in the above-captioned action, the Defendants fail to show any legitimate reason to warrant the Complaint's dismissal. Accordingly as set forth in the Memorandum below, and as the Plaintiffs hereby move, the Defendants' Motion to Dismiss should be denied in its entirety.

## Introduction

Instead of tackling head-on the Plaintiffs' allegations of lies and misrepresentations - by, for example, trying to demonstrate the claims were false - the Defendants instead attempt to dodge their legal straits by trying to convince the Court to accept the following propositions: first, lies are just lies. Second, even if they are more than that, it is too late for the Plaintiffs to seek redress for the harm they suffered. Certainly, lies are more than simple untruths when they are told in order to swindle the Plaintiffs out of their well-earned money. Moreover, the Plaintiffs' claims are not time-barred for the precise reason that the Defendants' lies hid the facts

that they now claim the Plaintiffs knew all along.

The salient facts of this case are outlined in great detail in the Complaint.[1] The Defendants seek to discredit the reliability of those facts not by demonstrating that they are false (which presumably would be easy enough to do, if that were the case) but by pointing out that the source of many of the facts is anonymous. Absent any ability to contradict the facts, the Defendants instead ask the court to "consider the source," and they insist that the anonymity of the source renders the facts fatally deficient.  However, what is inherently flawed is their argument - as the Plaintiffs' source has provided painstaking detail, including documentary evidence, regarding the Defendants' misdeeds, evidence which more than adequately passes muster at this early stage.

## FACTS

This case is about a carefully planned and executed deception by the Defendants to cause extreme harm to the Plaintiffs by depriving them of nearly the entire value of their holdings in HandsFree Networks, Inc. ("HandsFree").  Each of the Plaintiffs was a minority shareholder in HandsFree, and each was manipulated and misled by the actions of the Defendants.

HandsFree was founded in 1999, and its software product was one of the world's first remote computer support systems. In March 2008, after HandsFree had struggled for years with cash flow and profitability issues, the Defendant Acris Techonologies, Private, LTD., which was controlled by the defendant, Sridhar Santhanam, purchased a 60% interest in HandsFree. Santhanam then became the CEO of HandsFree.  In 2009, the Defendant, Satish Chandra ("Chandra") invested $1 million in Acris to obtain a controlling interest in that entity, and

---

[1] All references to the Complaint are to the Amended Complaint, which was filed solely to add a single additional plaintiff.

effectively became the controlling shareholder in HandsFree.  This much the minority shareholders all knew.  Much that followed, however, was kept from them.

In November 2010, HandsFree signed a contract with Dell to provide software. Ordinarily, such an event would give lifeblood to a company like HandsFree.  However, Santhanam and the Defendant, Alessandro Donnini sought to leverage this new relationship with Dell for their own benefit.  Despite the fact that Dell was pleased with the HandsFree product, Santhanam and Donnini passed along problem reports to Chandra.  This led to Chandra becoming disillusioned with the company and in May 2011, he signed an agreement with Santhanam in which the two agreed that Acris would exit its investment in HandsFree in exchange for Chandra receiving $2 million on his original $1 million investment. (*See* Ex. 1, Agreement).  They kept this secret from the minority shareholders.

The prospect of an agreement with Chandra galvanized Santhanam and Donnini at the expense of the Plaintiffs.  For the last half of 2011 and the first quarter of 2012, they requested that Dell not pay HandsFree invoices, requests that were made to devalue HandsFree. (*See* Ex. 2, email to Dell; Ex. 3, email from HandsFree to Dell; Ex. 4, spreadsheet from source) They did not inform the Plaintiffs of this. Moreover - and this is crucial - they failed to advise the Plaintiffs that Dell had indicated its goal was to increase the use of HandsFree software from 15% of the incoming customer calls to 55%, which would amount to an almost 400% increase in revenue to HandsFree. (*See* Exs. 5, 6, emails). HandsFree completed a test with HCL, a large service provider in India, in June 2011. This test also went well, and HCL signed a contract on November 10, 2011 (*See* Ex. 7, Software License Agreement).  The Plaintiffs were not informed of this.  Santhanam and Donnini did not want Chandra to go back on his May 2011 agreement, so they directed Dell to stop paying invoices from April 2011 to at least March 2012, and delayed further interaction with HCL until February 2012.

On October 3, 2011, Santhanam and Donnini, along with Vidhyacharan Ponnusamy, presented HandsFree to Kumar Shiralagi at IndoUS Venture Partners ("IUVP"), looking for an investment. They presented the true financial picture to IUVP, including the revenue from uncollected Dell invoices, the projected sales from Dell, the contract negotiation with HCL, and the projected sales from HCL. They also revealed the side agreement between Santhanam and Chandra, the need to buy out Chandra for $2 million, and their projected revenue of $15 million for 2012. (*See* Ex. 8, email; Ex. 9, Powerpoint Presentation).  IUVP agreed to invest at a valuation of $10 million. This information was all hidden from the Plaintiffs.

Santhanam and Donnini decided to get rid of the minority shareholders for virtually nothing, so they held a shareholder meeting on January 18, 2012. In the meeting, Santhanam said that "there's no great client running around the company today, we have in the last ten years of HFN history, we never had a good great name company as a client," and Donnini said "if you are even considering getting $2 for your shares, guess what, you can go buy yourself a cup of coffee that you wouldn't have been able to buy before." At the time, Santhanam had arranged to receive a 40% share of HFN Inc., the new shell company being formed from HandsFree's assets with IUVP's $10 million valuation, and Donnini had arranged to receive a 5% share of HFN.

In particular, all of the board members of HandsFree –Santhanam, Chandra, and Donnini, the board members of HFN – Santhanam, Donnini, and Shiralagi, and the Treasurer of HandsFree, Chetan Chandra (who signed over the $1 million payment to his father), hid the true revenue from the Dell contract, Dell's goal to substantially increase its use of the HandsFree software, the existence of the HCL contract, and the $10 million valuation that IUVP was putting on the assets of HandsFree.

The Defendants also hid this information from the U.S. Securities and Exchange Commission. An SEC Form D filed by the new company, HFN, on June 12, 2012 reported "no revenues" for HFN, despite the accrued revenue from the Dell contract that had been transferred from HandsFree to HFN.

The Defendants almost got away with their fraud scot free. However, in mid-2013, an informed source provided initial information and evidence to one of the Plaintiffs about the nature and magnitude of the fraud, which started the chain of events leading to this action.

## III.  ARGUMENT

A.      Standard of Review

To pass muster under FCRP 12(b)(6), a complaint must "contain sufficient factual matter to state a claim to relief that is plausible on its face."*Rodrigues-Reyez v. Molina-Rodriguez,* 711 F.3d 49, 53 (1st Cir. 2013). This standard does not mean that a complaint must state a *prima facie* case, and, in fact, does not even require detailed factual allegations. *Id.* at 54.  Rather, the relevant inquiry is whether the complaint as a whole rendered the plaintiffs'rentitlement to relief plausible. *Id.* at 55, citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 569 (2007).

FCRP 9(b) requires that claims of fraud must be pled with particularity. There are three purposes behind Rule 9(b)'s particularity requirement: (1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a "strike suit"; and (3) to safeguard defendants from frivolous charges which might damage their reputations. *New England Data Svcs. Inc v. Becher,* 829 F.2d 286 (1st Cir. 1987).  In the context of securities fraud claims, the First Circuit requires that a complaint specify the misleading statement or omission, show why the statement is

misleading by providing some factual support, and set forth the source of information and basis for belief. *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 194-195 (1st Cir. 1999).

As far as choice of law, for the Complaint's common law claims, Delaware law should apply. *Hoffman v. Optima Systems, Inc*., 683 F.Supp. 865, 872 (D.Mass.1988) ("Massachusetts law requires that a court look to the law of the state of incorporation to determine the corporation's liability to its stockholders or creditors."); *Beacon Wool Corp. v. Johnson*, 331 Mass. 274, 279, 119 N.E.2d 195, 198-99 (1954) ("Since the company was a Delaware corporation we must look to the law of that jurisdiction to determine the liability of the defendants for their acts as directors.").

B.   In Raising a Statute of Limitations Defense, the Defendants Inappropriately Resort to Facts Outside the Plain Face of the Complaint

In raising their statute of limitations argument in an FCRP 12(b)(6) Motion to Dismiss, the Defendants impermissibly refer to information contained in an American Appraisal report sent to the Plaintiff Shareholders on February 18, 2012. (MTD 3-4) Black letter law in this Circuit holds that an affirmative defense, such as the statute of limitations, may be raised at the 12(b)(6) stage of proceedings - but only "the facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'" *Blackstone Realty LLC v. FDIC*, 244 F.3d 193, 197 (1st Cir. 2001). Here, in their attempt to mount a statute of limitations defense, the Defendants do not draw on one single fact contained anywhere in the Complaint. (MTD 2) Accordingly, it should be disregarded entirely.

Even if the statute of limitations argument had been raised appropriately, however, the First Circuit has set an insuperably high standard for succeeding in such a challenge. A motion to dismiss may only be granted at this stage if the defendants "leave no room for doubt"ethat the asserted claim was time-barred. *LaChappelle v. Berkshire Life Ins.*, 142 F.3d 507, 509 (1st Cir.

1998). Even by their own reckoning, the Defendants leave substantial room for doubt. Indeed, what they present sheds little light on anything.

The Defendants correctly acknowledge that false statements were made during a call between Chandra, Santhanam and Donnini on one end and the plaintiff shareholders on the other. (MTD 6-7) In that call, the plaintiff shareholders were informed that HandsFree had no clients and no revenue. (Compl. ¶¶ 53-54) However, the Defendants then proffer the American Appraisal report and inappropriately point to a section of the report that states that HandsFree had "one live contract"nthat resulted in revenues of $300,000. (MTD 6-7)

In fact, as the Complaint discusses, the contract with Dell was fully known to the shareholders, so the fact that revenue from Dell was reported is no great revelation. (Compl. ¶ 28) Indeed, the Complaint notes that the AA Report discussed Dell revenue. (*Id.* ¶ 56) However, the AA Report only discusses revenues in 2011 and tells shareholders nothing of the state of the company in January 2012 at the time of the shareholder call. Moreover, as the Complaint describes, the revenue that was disclosed in the AA Report was inaccurate, because the Defendants took steps to ward Dell away from paying its invoices, in order to drive down the reported revenue. (Compl. ¶¶ 45-47)  Nor does the AA Report divulge anything about the secret deal HandsFree had with HCL, a milestone kept entirely hidden from the shareholders. For this information, the shareholders had to rely on the good faith of the Defendants on the other end of the call. Not until May 2013 did the shareholders learn they had been lied to. (Compl. ¶ 60) Hence, the Complaint is well within the statute of limitations and well beneath the high standard of "leave no room for doubt" required of this Court.

C.   The Complaint Provides Adequate Information that the Anonymous Source is Reliable

In their brief, the Defendants act as if the Complaint's entire allegations of fraud are contained in Paragraph 60, that a confidential source "blew the whistle" on the fraud to Miller and disclosed how the Dell revenue was manipulated and the HCL contract kept hidden. (MTD 6) In fact, the Complaint relies in part on emails between HandsFree and Dell and financial data that were supplied by the confidential source.

At any rate, the First Circuit has declined to adopt a rule which would "exclude confidential source allegations which have every indication both that the source had access to information and that the information has the earmarks of credibility, simply because the identity of the source is not initially revealed." *N.J. Carpenters Pension & Annuity Funds, Inc. v. Biogen IDEC*, 537 F.3d 35 52 (1st Cir. 2008). Indeed, the First Circuit has made it clear that courts can competently make a careful evaluation of securities fraud pleadings based on anonymous sources. *In re Cabletron*, 311 F3d. 11, 30 (1st Cir. 2002). Courts should consider, among other things, the level of detail the source provided, the coherence and plausibility of the information, the reliability of the sources and other indicators. *Id*. at 29.

Here, it is clear from the Complaint that the whistleblower was key enough a player at HandsFree to be privy to email exchanges between Santhanam and employees at Dell Corp., in which Santhanam requested that Dell hold off on paying its invoices so that revenue would appear to be lower than it really was. (Compl. ¶¶ 46-49) The Complaint provides the date, "to" and "from" lines and quotes extensively from the emails. (*Id.*) This is a clear indication that the contents of the emails that passed between the Defendants and Dell are in the Plaintiffs' possession, and the Plaintiffs are not relying on the whistleblower's recollection of the emails. Moreover, it is inappropriate at this stage to weigh whether those emails constitute admissible evidence. The information provided by the whistleblower also makes more coherent the fact that

8

IUVP purchased HandsFree at a price that indicates its valuation of HandsFree was at least $10 million. (*Id.* ¶51) Accordingly, the whistleblower's information has clear indicia of reliability.

> D.     The Defendants Incorrectly Construe the 10b-5 And Common Law Fraud Requirements

As argued in great detail below, the Plaintiffs have satisfied their burden under Rule 10(b)-5. As a result, they satisfy their burden under Rule 9(b), in pleading fraud with particularity.

> 1.  The Complaint Adequately Alleges Claims under Rule 10b-5(a) and (c)

The Complaint alleges violations of Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder. (Comp. ¶¶ 61-69)  A false statement is defined in Section 10(b) of the 1934 Exchange Act as any material statement that misleads or creates a false impression. Material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Texas Gulf Sulphur Co.*, 401 F.2d at 849. They include any fact "which in reasonable and objective contemplation might affect the value of the corporation's stock or securities." *Id.*

The Defendants correctly cite Rule 10b-5(b)'s requirement that plaintiffs allege a false or misleading statement (or omission), although their analysis is flawed and discussed in the next section below.

However, the Defendants raise no objections to the Complaint's claims under the more general provisions of Rule 10b-5(a) and (c).  Those sections prohibit the use of "any device, scheme, or artifice to defraud" nor the participation "in any act, practice, or course of business" that would perpetrate fraud on investors. 17 CFR §.240.10b-5. Because the Defendants do not raise objections to these sections, and it is inappropriate for the Court to consider them on its own in a 12(b)(6) motion, the Plaintiffs need not treat the matter further.

However, to ward off any possible questions of these claims, the Plaintiffs will briefly touch on the matter.

Claims under Rule 10b-5(a) and (c) are much less restricted than their counterpart in (b). *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972). To survive a motion to dismiss under these sections, plaintiffs must allege that "(1) they were injured; (2) in connection with the purchase or sale of securities; (3) by relying on a market for securities; (4) controlled or artificially affected by defendant's deceptive or manipulative conduct; and (5) the defendants engaged in the manipulative conduct with scienter." *In re Global Crossing Secur. Litig.,* 322 F.Supp.2d 319, 329 (S.D.N.Y. 2004); *SEC v. Zandford*, 535 U.S. 813, 824-25 (2002) (broker's actions constituted unlawful scheme under Rule 10b where broker's "fraudulent intent deprived the [plaintiffs] of the benefit of the sale").

Rule 9(b)'s particularity requirement does not extend to scienter. However, the First Circuit requires that the inference of scienter be reasonable and strong, but need not be irrefutable. *In re Cabletron* Sys., 311 F.3d at 40. Scienter may be demonstrated by indirect evidence, and may extend to a form of extreme recklessness that "is closer to a lesser form of intent," *Id.* Rather than a rigid formula, courts should use a "fact-specific approach" that proceeds case by case. *Id.* Allegations giving rise to a strong inference of scienter can be made by showing one of the following: 1) that the defendants "benefited in a concrete and personal way from the purported fraud," (2) that the defendants "engaged in deliberately illegal behavior," (3) that the defendants knew facts "suggesting that their public statements were not accurate," or (4) that the defendants "failed to check information they had a duty to monitor." *Ashland, Inc. v. Morgan Stanley & Co., Inc.,* 700 F. Supp.2d 453, 468 (S.D.N.Y. 1998).

All of these elements are plainly set forth in the Complaint. First, as shown below, the Plaintiffs were injured. Second, as shareholders, their injury was in connection with the sale of their securities. Third, the market here was the market that was described to the shareholders in the IUVP sale. Fourth, this market was controlled or artificially affected because it was presented to the shareholders in a misleading way.

The Defendants controlled the information that determined the value. The Defendants suppressed the true revenues from Dell, as well as the projected revenues from Dell, and hid the fact that HandsFree had a contract with HCL. Santhanam and Donnini pulled it off by actively undertaking the scheme, stalling the payment of invoices, refusing to disclose to the shareholders the important information about Dell's projected use of the software, and suppressing the news of the HCL contract. Satish Chandra was part of the scheme because, as a board member, he was aware of the actual state of HandsFree's business, but was part of the effort to keep this information from the shareholders. Moreover, as board members, Santhanam, Donnini and Chandra all approved of the sale of HandsFree to IUVP.  A board of directors can be held liable under 10b-5 for a fraudulent sale of securities. *Ruckle v. Roto American Corporation,* 339 F.2d 24, 29 (2d Cir. 1964).

Likewise, Chetan Chandra was Treasurer of HandsFree. (Compl. ¶ 88).  As such, he was aware of the actual state of HandsFree's business, and took part in the scheme to suppress the information.  He also paid out his father under the scheme at a rate that was unfair to the minority shareholders. Corporate officers may be liable for causing their corporation to engage in securities transactions. *Texas Gulf Sulphur,* 401 F.2d at 887.

A corporation may itself violate Rule 10b-5 if it engages in fraudulent activities in connection with a merger or other transaction involving securities. *Id*. Here, Acris was controlled by Chandra and a conduit through which the scheme was carried out.  (Compl. ¶¶ 37-40)

Finally, this manipulative conduct could not have been accomplished without scienter on the part of each Defendant. For instance, Santhanam and Donnini asserted falsehoods to the Plaintiff Shareholders and schemed to withhold Dell revenues in order to lower their perceived value of HandsFree (Compl. ¶¶ 45-47, 53). They also executed an agreement to treat one shareholder more favorably than the others (Compl. ¶ 40). Chandra executed an agreement for favorable treatment over other shareholders and kept it hidden from the Plaintiffs, despite his fiduciary duty to reveal its terms.

2.    The Complaint Alleges Actionable Statements and Omissions by
        Defendants under Rule 10b-5(b)

Rule 10b-5(b) requires a complaint to allege a fraudulent statement or omission. Contrary to the Defendants' brief, the Complaint alleges myriad fraudulent statements and omissions by the Defendants:

- Santhanam lied that the company had no prospects, knowing the company had signed a contract with HCL. (Compl. ¶ 53) He lied when he sent the shareholders a valuation report that he knew contained a false valuation of the company. (Compl. ¶ 56).

- Donnini told the shareholders that their stock was not worth more than a "cup of coffee"uso they should feel lucky for whatever they received. (Compl. ¶ 54)

- Satish Chandra was a member of the board of HandsFree and, thus, was under a duty of due care toward the shareholders.  As the Second Circuit has stated, the law is settled that when directors make decisions likely to affect shareholder welfare, the duty of due care requires that a director's decision be made on the basis of "reasonable diligence"ein

gathering and considering material information. *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274 (2d Cir. 1986).  It is reasonable to assume that Chandra was informed of the true state of HandsFree's financial condition.  Nevertheless, hearing Sanathanam and Donnini make fraudulent statement after fraudulent statement to the shareholders, Chandra remained silent.  "Silence, when there is a duty to speak, can itself be a fraud." *Texas Gulf Sulphur Co.*, 401 F.2d at 865.

Likewise, Chetan Chandra was an officer of the company, in fact, its Treasurer.  As such, like his father, he reasonably should have known of the true financial condition of the company.  Similarly, the side deal between Chandra and Santhanam centered around the ownership and value of Acris, and represented an enormous impact on the valuation of HandsFree that never appeared on the financial documents and was never reported to the shareholders.

3.    The Complaint Shows that the Defendants' Fraudulent Behavior Caused
        Damages.

The Defendants argue that the lies told to the shareholders didn't really matter, because the deal was going to go through anyway, no matter what the shareholders thought.  (MTD 10) It well may be that the Defendants disregarded the shareholders and planned to execute the deal regardless.  However, the Defendants acknowledge that the shareholders had at least one option - converting their stock in HandsFree to the new company, HFN. (MTD 5). By engaging in their efforts to convince the Plaintiffs that their shares were practically valueless, the Defendants essentially deprived the Plaintiffs of the opportunity to make a reasoned choice about accepting shares in HFN, a company the Plaintiffs now know to be worth at least $10 million. Thus, all of the information the Defendants withheld was material.  Material facts include those "which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities." *Texas Gulf Sulphur Co.*, 401 F.2d at 849.

4.  The Complaint Pleads Securities Fraud and Other Claims with Required  Particularity

Although the First Circuit has not approved a corporate group liability doctrine, most courts that have considered the subject in this circuit have relied for guidance on *Shields v. Amoskeag Bank Shares, Inc.*, 766 F.Supp. 32, 41 (D.N.H.1991), rev'd in part on other grounds sub nom. *Serabian v. Amoskeag Bank Shares, Inc.,* 24 F.3d 357 (1st Cir.1994); *see Margaret Hall Foundation v. Atlantic Financial Management, Inc.,* 572 F.Supp. 1475, 1481 (D.Mass.1983); *Goebel v. Schmidt Bros.*, 871 F.Supp. 68, 73 (D.Mass. 1994). *Amoskeag* states that, at a minimum, a complaint must meet 9(b)'s particularity requirement by alleging at a minimum: (1) the nature of each individual defendant's participation in the fraud; (2) whether the defendant is being sued as a primary defendant or as an aider or abettor; and (3) as to allegations on information and belief, a statement of the source of the information and the reasons upon which the belief is founded. *Amoskeag,* 766 F.Supp. at 41. More broadly, a securities plaintiff must allege "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *In re Peritus Software, Inc.*, 52 F.Supp.2d 211, 219 (D.Mass. 1999).

The Complaint here supplies more than this. The Complaint states that, aside from Chetan Chandra, Acris and HFN, Inc., each Defendant was a member of the HandsFree board, and, acting as such, each was present during the January 2012 call with the shareholders. (Compl. ¶ 24). As board members, the Defendants had a duty of diligence to have knowledge of the actual state of HandsFree's business. Yet without question, each Defendant on the call either provided false statements to the shareholders or was present while these false statements were made. (Compl. ¶¶ 53-54). Either way, by commission or omission, each Defendant on the call participated in the fraud.

14

As to Chetan Chandra, as the Complaint states, Mr. Chandra was the Treasurer of HandsFree. (Compl. ¶ 88).  As such, he was both an officer of the company and to a certainty, knew of the actual state of HandsFree's business.

The Complaint alleges three pieces of critical information that were withheld from the Plaintiff Shareholders.  First, the Complaint states that the company directed Dell to refrain from paying HandsFree invoices in order to depress HandsFree's stated revenue.  The Defendants argue that the Complaint does not specify who took part in the negotiation, or who was aware of the unpaid invoices. However, the Complaint indeed alleges that the Defendants were aware of the hidden Dell revenue.  (Compl. ¶¶ 45-47).  The Complaint also alleges that Defendants Santhanam and Donnini made a presentation to IUVP in which the true financial picture of the company was discussed.  (Compl. ¶ 50).

As to the second critical piece of information, the Complaint alleges the Defendants withheld a key projection from Dell on what HandsFree's revenue would likely be in the coming years. The Defendants argue that the Complaint does not provide "concrete information" regarding these projections and does not state whether they were "specific or concrete enough"pto result in actual revenue. (MTD 8). The Defendants criticize Paragraph 28 for being overly general, but fail to note that the paragraph is smack in the middle of the "Overview" preface to the specific fact section of the Complaint. Deeper in the Complaint, Paragraph 43 provides the specifics that the Defendants supposedly crave - Dell projected a fivefold increase in earnings to HandsFree. Santhanam and Donnini knew this information but kept it from the shareholders. (Compl. ¶ 50) Santhanam and Donnini knew of the Dell projections and considered them reliable enough that they included them in a presentation to NEA-IUVP.  (*Id.*).

15

In turn, NEA-IUVP considered these projections reliable enough that it then bought HandsFree at a price far higher than the valuation presented to the Plaintiff Shareholders. (*Id.* ¶ 51)

Contrary to the Defendants' assertion, the Complaint does not state a cause of action around the fact that the Defendants gave a rosy presentation to potential investors. (MTD 8-9) Rather, the Complaint alleges that the Defendants were aware of specific facts, kept them from the shareholders, but used them when they knew that a reasonable person would consider them material to valuing the company at a higher range than the shareholders were aware. *(Id.* ¶ 48)

The Defendants criticize the Complaint for not disclosing more concrete information about the HCL contract.  Rule 9(b) is not a requirement for more concrete information, however, but only one of particularity.  Here, the Complaint has stated that a contract with HCL had been executed at the time the shareholders were told that only one active contract - presumably the one with Dell - existed. (*Id.* ¶49) Santhanam and Donnini were aware that this was the case, kept the information from the shareholders. (*Id.*) Yet they knew that this information was material enough to a valuation that they discussed it with IUVP. *(Id.* ¶50).

5.    The Complaint Alleges Reliance

Similar to their Statute of Limitations argument, the Defendants argue that the Complaint does not allege that the Plaintiffs could not have relied on the Defendants' false statements because they received the AA Report, which discussed a portion of HandsFree's actual revenues from Dell.  (MTD 9-10) However, as the Complaint makes clear, that report only provided a portion of Dell's true payments to HandsFree. In fact, the AA Report does not even disclose that the contract was with Dell. Nor does it disclose any contract with HCL.

By underreporting the Dell revenue and omitting the HCL contract, the AA Report arrives at a valuation far below HandsFree's actual worth. The Complaint states that the

HandsFree management was the sole source of the information the AA Report considered, and, unless the Plaintiff Shareholders could have wrested the information from the prospective buyers who received accurate pictures of HandsFree's true position, the Defendants were the sole source of information for the Plaintiffs.  (Compl. ¶ 56)  Moreover, the shareholders sought to obtain information but were rebuffed.  *(Id.* ¶ 54)  Accordingly, the facts here are inapposite those considered in *Ashland, Inc. v. Morgan Stanley,* 700 F.Supp.2d at 469. In that case, the facts were publicly and readily available to a sophisticated company.  The facts are also inapposite those in the bankruptcy case, *In re Access Cardiosystems,Inc.,* 404 B.R. 593 (D.Mass. 2012), because here, the published facts do not correct the statements made orally.

The Defendants also argue that they should be released from liability because, they argue, the Plaintiffs did not exert any affirmative action in reliance on the information misrepresented to them (MTD 10).  However, exactly oppose the facts in the *Touch of Italy Salumeria and Pasticcera v. Bascio*,  Civ. No. 8602-VCG, 2014 WL 108895, at *5 (Del. Ch. Jan. 13, 2014) case offered by the Defendants, here the Complaint plainly alleges that the Plaintiffs refrained from taking meaningful actions.  Instead of opting to retain their shares, they took the default option and allowed their shares to be redeemed.  (Compl. ¶ 25) As in the Tao De Ching, the shareholders' action took the form of doing by not doing.

6.    The Complaint Alleges Causation

In the last sentence of their section arguing that the Plaintiffs did not allege loss causation, the Defendants write, "Indeed, Plaintiffs could have been shareholders in the new corporation, but they elected not to be." (MTD 11) This sentence seems to refute any argument that could be made on loss causation. If the shareholders knew that the new company, with exactly the same assets as the old company, was valued significantly higher and reasonably stood

to rocket even higher in value, then a reasonable shareholder would have opted to hang on to their shares.  The Plaintiffs were deprived of this information, however, and, by misleading the Plaintiffs in this way, the Defendants caused the Plaintiffs' loss.

7.      The Complaint States a Control Person under 20(a)

The Defendants argue that the Plaintiffs do not state a control person for liability under Section 20(a).  The Defendants's argument is premature. Control is a question of fact that "will not ordinarily be resolved summarily at the pleading stage." *In re Cabletron*, 311 F.3d at 41, quoting 2 T.L. Hazen, Treatise on the Law of Securities Regulation §a12.24(1) (4th ed.2002). In look at a complaint at the pleading stage, a court seeks "indicia of the exercise of control over the entity primarily liable"nor facts which indicated they were "actively participating in the decisionmaking processes of the corporation". *In re Novell*, *Inc. S'holder Litig*., CIV.A. 10-12076-RWZ, 2012 WL 458500 (D. Mass. Feb. 10, 2012)

In this regard, the Complaint could not be plainer. Chandra was present at the January shareholder call and actually made statements perpetuating the fraud. (Compl. ¶ 54) Clearly, Santhanam and Donnini were in it up to their ears. As treasurer of the company, Chetan Chandra was primarily responsible for the company's financial information.

E.      The Complaint States Claims For Breach of Fiduciary Duty

1.      The Plaintiffs Have Plead A Duty Owed by Santhanam and Donnini

The Defendants misinterpret the Plaintiffs' Fiduciary Duty claims as to Santhanam and Donnini.  Donnini and Santhanam, are identified in the Complaint as being on the Board of HandsFree, and the Complaint alleges that each owed a fidciary duty to  plaintiffs by virtue "of their status" as of HandsFree. The Defendants construe the word "their" as  modifying both Santhanam (or Donnini) and the Plaintiffs.  In fact, it modifies only the Plaintiffs, such that the

Complaint alleges that Santhanam and Donnini, as members of the Board of HandsFree, owed a fiduciary duty to the Plaintiffs, because the Plaintiffs were shareholders.  The Defendants do not appear to dispute that members of the Board of Directors owe a fiduciary duty to shareholders. Indeed, they cannot, as ironclad law holds that a board's power to act derives from its fundamental duty and obligation to protect the corporate enterprise, which includes stockholders, from harm. *Unocal v. Mesa Petroleum Corp.*, 493 A2d 946, 954 (Del. 1985).

2.      Plaintiffs Have Pled A Breach Of Fiduciary Duty As To Acris

Acris, the majority shareholder in HandsFree, owed a separate fiduciary duty to minority shareholders in its capacity as majority shareholder which requires "complete candor" in disclosing fully "all of the facts and circumstances surrounding the" tender offer.  *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 279 (Del. 1978).  As such, it had a duty to reveal the secret agreement it had reached with Santhanam (Ex. 1), which is alleged to be a prime reason for the actions taken by Santhanam and Donnini.  Acris' failure to reveal the agreement constitutes a breach, which clearly resulted in harm to the Plaintiffs.

3.      Plaintiffs Have Plead A Breach of Fiduciary Duty As To Chetan Chandra

As the treasurer of HandsFree, Chetan Chandra owed a fiduciary duty of care and loyalty to the company and its shareholders. *Gantler v. Stephens,* 965 A.2d 695 (Del. 2009).  The Complaint alleges that as Treasurer, Chetan Chandra knew of the actual state of HandsFree's business.  This triggered his obligations to report the information to the minority shareholders particularly where, as Treasurer, he was similarly aware of the scheme under which he also paid out his father a rate that was unfair to the minority shareholders.

F.      The Complaint States A Claim For Civil Conspiracy

While the Defendants correctly articulate the elements of a claim for civil conspiracy under Delaware law, they utterly fail to account for the facts that are painstakingly alleged in the Complaint, that detail the concerted acts of the Defendants designed to deprive the minority shareholders of the value of their investment.  Any fair reading of the Complaint reveals that the concerted acts of the Defendants  to design meetings, including the sales pitch to IUVP and the shareholders conference call, provide more than adequate facts on which to base a claim for civil conspiracy.

## CONCLUSION

Because the Complaint has adequately alleged facts supporting its claims, the Defendants' Motion to Dismiss should be denied. Accordingly, the Plaintiffs move that the Defendants' motion be denied.

Respectfully Submitted,
The Plaintiffs,
By Their Attorneys,


   /s/ Patrick J. Dolan
Patrick J. Dolan  BBO #564250
*pdolan@pkdllp.com*
Perry, Krumsiek & Dolan, LLP
210 Union Wharf
Boston, MA 02109
617-720-4300
617-720-4310 (faxt)

   /s/ Timothy Cornell
Timothy Cornell BBO #654412
*Timothycornell5@gmail.com*
Gardner Cornell, P.C.
33 Mount Vernon Street
Boston, MA 02107
603-277-0838


DATE:  September 5, 2014

**CERTIFICATE OF SERVICE**

I, Patrick J. Dolan, certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on September 5,

2014.

_____/s/ Patrick J. Dolan_____